NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals for the District of Columbia Circuit

**No. 25-5050**

(Consolidated with 25-5051)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

CRYSTAL WORLD HOLDINGS, INC.,

*Defendant-Appellant,*

NEW SPORTS ECONOMY INSTITUTE; CHRISTOPHER PAUL RABALAIS,

*Defendants-Appellees.*

*On Appeal from the Decision of the United States District Court for the District of Columbia in No. 1:19-cv-02490-CJN, Honorable Carl J. Nichols, U.S. District Judge.*

# PROOF REPLY BRIEF FOR DEFENDANTS-APPELLANTS

SEAN T. PROSSER
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
(858) 314-1500
stprosser@mintz.com

CLARE PROBER
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000
cprober@mintz.com

*Counsel for Defendants-Appellants Crystal World Holdings and New Sports Economy Institute*

November 12, 2026

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (398228)

# TABLE OF CONTENTS


**Page**

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 5

I. THE DISTRICT COURT ABUSED ITS DISCRETION BY SHIFTING THE BURDEN OF APPORTIONMENT FROM THE SEC TO APPELLANTS, AND THEN REFUSING TO CONDUCT AN EVIDENTIARY HEARING REGARDING IT .......... 5

A. Appellants did not waive their right to an evidentiary hearing .......... 5

B. *Smyth* supports an evidentiary hearing in these circumstances .......... 8

C. CWH and NSEI were prejudiced .......... 12

II. THE SHARE-VALUE ISSUE WAS BEFORE THE DISTRICT COURT AND THE SEC DID NOT CARRY ITS INITIAL BURDEN .......... 14

A. Appellants raised and the District Court addressed the value of the shares retained by donors in its disgorgement analysis .......... 14

B. The District Court's "worthless shares" premise was not confined to the money penalty issue .......... 16

C. Even *if* the issue were forfeited, this Court still should reach it .......... 18

D. The SEC, not CWH and NSEI, bore the initial burden of approximating net profits, and failed to meet that burden by assigning a zero value to the shares retained by investors .......... 19

III. THE DISTRICT COURT MISAPPLIED *LIU* IN DISALLOWING ALL PROMOTIONAL AND CHARITABLE EXPENSES ........ 24

A. *Liu* does not impose a "corporate mission" nexus requirement ........ 24

B. The all-or-nothing disallowance of promotional expenses was not a reasonable approximation ........ 25

C. Charitable payments to third parties were never retained by nor unjustly enriched CWH and NSEI. ........ 29

D. CEO compensation ........ 31

CONCLUSION ........ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Cancer Soc'y v. Cook*,
675 F.3d 524 (5th Cir. 2012) .................... 30

*Azima v. RAK Inv. Auth.*,
926 F.3d 870 (D.C. Cir. 2019) .................... 6

*Boddie v. Connecticut*,
401 U.S. 371 (1971) .................... 7

*D&S Consulting, Inc. v. Kingdom of Saudi Arabia*,
961 F.3d 1209 (D.C. Cir. 2020) .................... 6

*Ehrlich v. Perper*,
337 F.2d 546 (D.C. Cir. 1964) (per curiam) .................... 18, 19

*Hormel v. Helvering*,
312 U.S. 552 (1941) .................... 18

*Huron v. Cobert*,
809 F.3d 1274 (D.C. Cir. 2016) .................... 18

*Liu v. SEC*,
591 U.S. 72 (2020) .................... 4, 19, 24,25, 29, 30, 32

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) .................... 6

*Ray Consol. Copper Co. v. United States*,
268 U.S. 373 (1925) .................... 21, 22

*SEC v. Aerokinetic Energy Corp.*,
444 F. App'x 382 (11th Cir. 2011) .................... 8, 9

*SEC v. Complete Bus. Sols. Grp., Inc.*,
No. 20-CV-81205-RAR, slip op. (S.D. Fla. Oct. 25, 2022),
ECF No. 1432 .................... 13, 25, 27, 29

*SEC v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) .............................................. 19, 23, 26

*SEC v. Govil*,
86 F.4th 89 (2d Cir. 2023) ............................................................... 16

*SEC v. Hallam*,
42 F.4th 316 (5th Cir. 2020) ...................................................... 10, 11

*SEC v. Kumar*,
No. 26-CV-0184-CVE-JFJ, 2026 U.S. Dist. LEXIS 225065
(N.D. Okla. Oct. 1, 2026) .............................................. 4, 18, 20, 25, 31

*SEC v. Smyth*,
420 F.3d 1225 (11th Cir. 2005) ........................................................... 8

*SEC v. Team Res., Inc.*,
No. 22-10359, 2023 U.S. App. LEXIS 2564 (5th Cir. Feb.
1, 2023) ........................................................................................ 9, 10

*SEC v. Team Res., Inc.*,
942 F.3d 272 (5th Cir. 2019), *vacated on other grounds*,
141 S. Ct. 186 (2020) ........................................................................... 9

*SEC v. Wash. Inv. Network*,
475 F.3d 392 (D.C. Cir. 2007) ........................................................... 16

*SEC v. Whittemore*,
659 F.3d 1 (D.C. Cir. 2011) ............................................................... 21

*Sripetch v. SEC*,
608 U.S. 555 (2026) ........................................................................ 4, 18

*Yee v. City of Escondido*,
503 U.S. 519 (1992) ............................................................................ 16

*Zacharias v. SEC*,
569 F.3d 458 (D.C. Cir. 2009) ........................................................... 21

**Federal Statutes**

15 U.S.C. § 77t(d) ................................................................................. 10

15 U.S.C § 78u(d)(3) .......... 10

**Federal Rules**

Federal Rule of Civil Procedure 78(b) .......... 11

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **ASM** | AllSportsMarket |
| **CWH** | Crystal World Holdings, Inc. |
| **DCF** | Discounted Cash Flow |
| **JA** | Joint Appendix |
| **NSEI** | The New Sports Economy Institute |
| **OIP** | Order Instituting Proceedings |
| **Opening Br.** | Appellants' Opening Brief |
| **SEC** | U.S. Securities and Exchange Commission |
| **SEC Br.** | Appellee's Opening Brief |

## SUMMARY OF ARGUMENT

The disgorgement award should be vacated because the District Court failed to consider whether substantial legitimate business expenses and the value of the shares delivered to and retained by shareholders should be deducted. Confronted with clear errors in the Opinion (Dkt. 90) and Hearing Transcript (Dkt. 89), the SEC mischaracterizes those documents and the record below. Each of its arguments fails.

**First,** the SEC wrongly contends that Appellants Crystal World Holdings, Inc. ("CWH") and The New Sports Economy Institutes ("NSEI") (collectively, "Appellants") waived their right to an evidentiary hearing because their consent to Partial Judgment on liability (Dkt. 65) provided that the District Court "may determine" remedies on written evidence. (*Id.* at 4). Such permissive language is not a knowing waiver of the right to be heard on disputed facts—particularly where the same paragraph uses mandatory language elsewhere. *Id.* (*e.g.*, "The Court *shall*," and "Defendants *will be*," and "Defendants *shall*") (emphasis added). The District Court prejudiced Appellants by shifting to them the SEC's initial burden to provide a "reasonable approximation" of ill-gotten gains

(Opening Br. at 18), and then denying the requested evidentiary hearing needed to carry that burden. The SEC's out-of-circuit authorities fail for the reasons below.

**Second**, the SEC's contention that share value was addressed below only in the civil-penalty context, not disgorgement, is wrong. CWH and NSEI asserted that the donor-shareholders "still hold their shares," that the SEC offered "no evidence" for its conclusion that the shares were worthless, and that the SEC failed to provide the required reasonable approximation of net profits. Dkt. 81 at 18, 23–24 (addressing *disgorgement* and emphasizing that the SEC failed to support its conclusory assertion that CWH's unregistered shares are "worthless"—despite the SEC's own prior statements that the company is worth "north of $750,000" and that its IP is "potentially worth millions"—and describing Appellants' products, IP, and trading platform, which has over 14,000 accounts). The Opinion likewise addresses share value within its *disgorgement* analysis. Dkt. 90 at 3–4 (under *Section II Analysis* / *Part A Disgorgement*: noting Appellants "[i]nsist[] that the donors still hold shares that may someday prove valuable" and that the SEC "failed to establish any amount of pecuniary harm that disgorgement would

remedy . . . .”). And the District Court stated in the *Background* section that “the ASM platform could someday turn a profit—and thus that the shares, if registered, could be of value.” Dkt. 90 at 3. That premise—that private-company shares could have value only if registered—is a fundamental reversible error. The SEC does not rebut the authorities establishing that private-company shares have measurable value without registration or a public market, *see* Opening Br. 20–23; rather, it simply dismisses them as a “red herring,” conceding that private companies do have value. SEC Br. 30. But then the SEC claims it “has never argued, nor did the District Court suggest, that shares cannot be valued just because they are issued by a company that has not conducted a public offering.” *Id.* The record says otherwise. Below, the SEC argued the CWH shares “are effectively worthless today without being registered,” Dkt. 66 at 7 n.5, insisted they “have no value today because they are not registered” and are “worthless today because they are unregistered,” Dkt. 85 at 14–15. The District Court accepted that erroneous premise, reasoning the shares could have value only “if registered,” Dkt. 90 at 3, and refused to assign the shares any value in calculating disgorgement. Having prevailed on that improper argument,

the SEC cannot disown it now that it is indefensible. Its new stance does not characterize the record; it attempts to rewrite it.

Even if the share value issue were not raised below, this Court may address it under *Sripetch v. SEC*, 608 U.S. 555 (2026), which reframed the analysis of investor-held value. On the merits, the SEC—which told the District Court that CWH's intellectual property was "potentially worth millions"—could not satisfy its initial burden to reasonably approximate net profits by assigning zero value to the shares retained by the donors. Dkt. 66 at 4. The SEC is not entitled to argue an issuer's IP assets may be worth millions to support its penalty motion, and then ignore that same value when arguing the equity in the same entity is "worthless" to inflate disgorgement. *See infra* Part II. "[D]isgorgement "looks only to the wrongdoer's gain," not investors' losses, *SEC v. Kumar*, No. 26-CV-0184-CVE-JFJ, 2026 U.S. Dist. LEXIS 225065, at *38 (N.D. Okla. Oct. 1, 2026), and the District Court's refusal to offset disgorgement by the value of retained shares measures only the latter.

**Third,** *Liu v. SEC* requires deduction of "all marginal costs incurred in producing the revenues that are subject to disgorgement," except wrongful *gains* "under another name." 591 U.S. 72, 91–92 (2020).

The District Court recognized that promotional expenses served legitimate purposes yet barred their deduction. Appellants' donations to unaffiliated public charities were consistent with their representations to donors, and such *unretained* sums—like monies spent to develop, support, and test the legitimate ASM platform—cannot be "wrongful gains." Nor does *Liu* require a nexus to Appellants' "corporate mission," as the District Court wrongly concluded. Dkt. 90 at 6.

## ARGUMENT

### I. THE DISTRICT COURT ABUSED ITS DISCRETION BY SHIFTING THE BURDEN OF APPORTIONMENT FROM THE SEC TO APPELLANTS, AND THEN REFUSING TO CONDUCT AN EVIDENTIARY HEARING REGARDING IT

#### A. Appellants did not waive their right to an evidentiary hearing

The SEC's lead argument is that CWH and NSEI "waived any right to a live evidentiary hearing" by consenting to the Partial Judgment on liability, which set a process governing the SEC's remedies motion. *See* SEC Br. 41; Dkt. 65 at 4. The text does not support that reading. It provides that, "[i]n connection with the SEC's motion for disgorgement and/or civil penalties, *and at any hearing held on such a motion*," four ground rules apply, the last being that "the Court *may* determine the issues raised in the motion on the basis of affidavits, declarations,

excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c).” Dkt. 65 at 4 (emphasis added); *accord* Dkt. 57-3 at 4 (¶ IV).

Two features of that language are decisive. First, “may” is permissive. It authorizes the District Court to rely on written evidence but neither forecloses live testimony nor relieves the court of its obligation to exercise discretion soundly when the written record proves insufficient. *See, e.g.*, *D&S Consulting, Inc. v. Kingdom of Saudi Arabia*, 961 F.3d 1209, 1213 (D.C. Cir. 2020) (contrasting mandatory clauses with permissive ones); *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874–75 (D.C. Cir. 2019) (absent explicit exclusion language, optional “may” provisions do not strip a party of or waive alternative legal avenues); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 607 (D.C. Cir. 2017) (“It should go without saying that ‘may means may’ and ‘may’ is, of course, ‘permissive rather than obligatory’”).

Second, the provision expressly anticipates a hearing and thus cannot fairly be read to waive one. The SEC concedes as much, acknowledging that the Consent “did not lock the court into holding a live

evidentiary hearing" (SEC Br. 41)—that is, it left the question to the District Court's discretion. The District Court abused that discretion.

The District Court's own statements further undercut the SEC's waiver theory. At the outset of the hearing, the Court stated: "I'm not going to hear evidence, I'm not going to hear testimony. I don't think that's necessary *yet. Obviously, to the extent I determine it is necessary, we'll cross that bridge later*." Dkt. 89 at 3:3–6 (emphasis added). At the close, the District Court reiterated: "If for whatever reason it turns out not to be the case that I can do that, I'll contact the parties and *we'll schedule a hearing*." *Id.* at 67:10–12 (emphasis added). The District Court did not view the Partial Judgment as foreclosing an evidentiary hearing. The question is not one of waiver, but whether the District Court erred by resolving the apportionment dispute against Appellants on a record it found insufficiently precise.

Nor does the SEC's due-process discussion change the analysis. While an opportunity to be heard may be "subject to waiver," SEC Br. at 47 (citing *Boddie v. Connecticut*, 401 U.S. 371, 378–79 (1971)), the SEC identifies no language in the Partial Judgment or Appellants' Consent to it waiving the opportunity to present testimony on disputed facts. A

provision authorizing the District Court to proceed on written evidence "without regard to the standards for summary judgment" addresses the evidentiary standard; it is not a surrender of the right to a fair opportunity to carry a burden imposed by the District Court. Dkt. 65 at 4; *accord* Dkt. 57-3 at 4 (¶ IV).

### B. *Smyth* supports an evidentiary hearing in these circumstances

*SEC v. Smyth*, 420 F.3d 1225 (11th Cir. 2005), is the leading appellate case addressing this scenario. Like here, the defendant in *Smyth* consented to a bifurcated judgment enjoining him from violating securities laws but contested the SEC's proposed monetary remedies. *Id.* at 1228–29. The district court entered a final remedies order based strictly on briefs and written declarations. *Id.* at 1229–30. The Eleventh Circuit *vacated* the judgment, holding the lower court abused its discretion and violated due process by failing to convene an evidentiary hearing where (as here) the defendant had proffered evidence to dispute the SEC's calculation of ill-gotten gains. *Id.* at 1230, 1232–33, 1232 n.13.

The SEC's cases are inapposite. SEC Br. 41–47. In *SEC v. Aerokinetic Energy Corp.*, the Eleventh Circuit found no abuse of discretion because, unlike Appellants, the defendants "neither requested

[an evidentiary hearing] nor objected" when the magistrate judge limited the proceeding to argument of counsel. 444 F. App'x 382, 385 (11th Cir. 2011). CWH and NSEI, by contrast, repeatedly requested an evidentiary hearing to resolve disputed facts. *See e.g.*, Dkt. 78 at 1, 27; Dkt. 79 at 1, 27; Dkt. 81 at 1, 34; Dkt. 83, at 1, 34. *Aerokinetic* also predates *Liu*, so the factual question on which CWH and NSEI sought a hearing—whether their expenses were legitimate *Liu* deductions—was not at issue.

In *SEC v. Team Res.*, the parties "agreed that the district court could calculate disgorgement and penalties on the basis of the papers alone." No. 22-10359, 2023 U.S. App. LEXIS 2564, at *6 (5th Cir. Feb. 1, 2023). But that posture differs markedly from this case. In the first appeal, the Fifth Circuit emphasized that the defendants "never moved for a hearing" and "chose not to pursue discovery when it was available," and it distinguished *Smyth* on precisely that ground: "[i]n *Smyth*, the defendant requested a hearing, but the district court denied the motion," whereas the defendants "never moved for a hearing, so *Smyth* does not help them." *SEC v. Team Res., Inc.*, 942 F.3d 272, 278–79 (5th Cir. 2019), *vacated on other grounds*, 141 S. Ct. 186 (2020). On remand, the

defendants "submitted no rebuttal documentary evidence," and the court resolved disgorgement "on the Government's uncontradicted documentary evidence." 2023 U.S. App. LEXIS 2564, at *1–2, *5–6. Here, by contrast, CWH and NSEI expressly requested an evidentiary hearing, Dkt. 78 at 27; Dkt. 79 at 27; Dkt. 81 at 34, submitted more than 600 pages of exhibits contesting the SEC's figures, Dkt. 78-1, and the District Court denied the request and resolved a contested record against them—the very circumstance the Fifth Circuit identified as the one in which *Smyth* applies. Further, on remand Appellants will present witnesses to explain the previously rejected documentary evidence.

*SEC v. Hallam* distinguished *Smyth* because there was no "promise of new, 'essential' evidence to be introduced during the requested hearing." 42 F.4th 316, 324 (5th Cir. 2022). *See* SEC Br. 42, 46–47. First, *Hallam* did not involve disputed *Liu* deductions. As the SEC admits, *Hallam* approved deciding a civil *penalty* amount "on the record and briefs." SEC Br. 42. A penalty determination under the statutory tiers of 15 U.S.C. § 77t(d) and 15 U.S.C § 78u(d)(3) does not turn on contested facts about the purpose of particular expenditures. The issue here—whether the retained shares' value, $733,488 in promotional expenses,

and $169,534 in charitable payments were legitimate *Liu* deductions—is one the District Court itself treated as fact-dependent.

*Second,* CWH and NSEI explained why live testimony was essential. *Hallam* found *Smyth* "easily distinguishable" because no new, essential evidence had been promised. 42 F.4th at 324. CWH and NSEI sought a hearing because the District Court "will have to credit the factual representations of one side or the other," and "[t]he best way for the District Court to make credibility determinations is by listening to witnesses who will be subjected to cross-examination." Dkt. 81 at 34; *see also* Dkt. 78 at 27; Dkt. 79 at 27. The District Court did not reject that request as improper or unnecessary; it said testimony was not "necessary yet" and that "to the extent I determine it is necessary, we'll cross that bridge later." Dkt. 89 at 3:4–6.

Finally, the SEC's attempt to distinguish *Smyth* because the stipulation there did not expressly authorize decision on written submissions, SEC Br. 46, proves little. The Consent here likewise did not authorize the court to decide disputed facts against a party while refusing the evidence that would resolve them. And the SEC's reliance on Federal Rule of Civil Procedure 78(b) and the discretionary nature of hearings,

SEC Br. 43–44, merely restates the standard of review. Discretion is abused when exercised to foreclose a party from meeting a burden the court imposes.

### C. CWH and NSEI were prejudiced

The SEC argues that CWH and NSEI never explained how they were prejudiced or which witnesses they would have called. SEC Br. 42–43. But the Opinion itself shows the prejudice. The District Court improperly shifted the SEC's burden to CWH and NSEI "to demonstrate how and why [the SEC's] approximation is inappropriate," and then denied the deduction because CWH and NSEI had not divided the promotional expenses "more precisely." Dkt. 90 at 6. The SEC itself argues that the expense chart's descriptions were too "cursory" to permit apportionment. SEC Br. 37. The evidence needed to cure that deficiency—testimony from the persons who authorized and managed each expenditure about its purpose and audience—is precisely what a chart and bank statements cannot supply.

The record confirms that such testimony existed and would have mattered. Asked whether the public-relations expenses promoted the donation program, CWH's current CEO, Chad Deihl, answered: "It

wasn't advertising the donation program, per se. It was to advertise [the] ASM [platform] and to get some excitement going to try and get more people onto the pilot market . . . so we could show that . . . the system actually worked like . . . an actual marketplace." Dkt. 78-1 at 196:25–197:6. The SEC's counsel acknowledged that the promotional expenses "were intended to promote the AllSportsMarket platform," and that the SEC was "not contending there's anything wrong with the SportShares or with the platform itself." Dkt. 89 at 15:13–24. Witnesses with personal knowledge would have walked the District Court through each line item—Media Rewards Canada's regulatory and league-development work, the Lucky Strike and Super Bowl events, the New York Times advertisement, the public-relations retainer—and identified which targeted the platform's trading users and which, if any, targeted prospective donors. Without that testimony, the court defaulted to a zero deduction. Courts resolving contested expense deductions after *Liu* have relied on that kind of testimony. *See SEC v. Complete Bus. Sols. Grp., Inc.*, No. 20-CV-81205-RAR, slip op. at 1, 21–22, 24 (S.D. Fla. Oct. 25, 2022), ECF No. 1432 (holding evidentiary hearing on disgorgement and

relying on live questioning of receiver to confirm that disputed expenses were "operational in nature" and legitimate).

The SEC's observation that CWH and NSEI did not serve discovery or attend Christopher Rabalais's deposition, SEC Br. 42–43, is irrelevant. The apportionment burden did not require documents from the SEC; it required CWH and NSEI's own witnesses to explain their own expenditures. Those witnesses were available, and CWH and NSEI sought a hearing so the court could "listen[] to witnesses who will be subjected to cross-examination." Dkt. 81 at 34; *see also* Dkt. 78 at 27; Dkt. 79 at 27. Live, cross-examined testimony is also the best mechanism for addressing the SEC's hearsay objection to the marketing-invoice exhibit, which the District Court never resolved. *See* SEC Br. 36 n.4.

## II. THE SHARE-VALUE ISSUE WAS BEFORE THE DISTRICT COURT AND THE SEC DID NOT CARRY ITS INITIAL BURDEN

### A. Appellants raised and the District Court addressed the value of the shares retained by donors in its disgorgement analysis

The SEC contends that "[a]t no point did the defendants ask the court to make deductions or offsets based on the purported value of the Crystal World shares." SEC Br. 10, 21–24. The record refutes that. Opposing the remedies motion, CWH and NSEI argued that "the

investors still hold their shares"; that they may well be able to trade them in the near future"; that the SEC "does not offer any evidence in support of any of its contentions concerning valuation," including "its statement that the shares are worthless"; and that its "100%" discount position lacked "evidence or legal authority." Dkt. 81 at 23–25. Under a separate heading, they argued that "the SEC has not offered the court a 'reasonable approximation of the profits causally connected to the violation' and that, as a result, the burden of proof should not be shifted to them." *Id.* at 18; *see also* Dkt. 78 at 14 (arguing the requested disgorgement "exceeds the defendants' net profits"); Dkt. 79 at 14 (same). At oral argument, counsel stated that "it's very clear that the current value of the shares is not nothing," and "the value is not zero and it's not a hundred percent loss to the investors." Dkt. 89 at 58:11–59:1.

The District Court understood these arguments as bearing on disgorgement and addressed them there. Its disgorgement analysis summarizes CWH and NSEI's position as "[i]nsisting that the donors still hold shares that may someday prove valuable, or at a minimum that the SEC has failed to establish the specific amount of loss suffered by donors." Dkt. 90 at 3–4. It then resolved the point, stating that "it is

difficult to treat such harm as significantly probative when the current value of the donors' 'shares' is quite speculative," before fixing the "upper bound of disgorgement" at the full $1,805,274.93 in donations. *Id.* at 5. An issue the District Court considered and resolved below is not forfeited. *See SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007).

The SEC responds that the parties discussed share value only in connection with the now-abrogated pecuniary-harm rule of *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023). SEC Br. 22–23. But the label attached to an argument does not limit the issue preserved. A party may make "any argument in support of" a properly presented claim and is "not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). The issue below—whether the SEC's gross-receipts figure overstated net unjust enrichment given that donors retained their shares—is the issue on appeal. *Govil* was merely the vehicle for a point CWH and NSEI raised: the shares returned value to investors, and the SEC had no basis for valuing them at zero.

### B. The District Court's "worthless shares" premise was not confined to the money penalty issue

The SEC asserts the District Court's observation that "the shares, if registered, could be of value" was made "only as a reason for reducing

CWH and NSEI's civil penalties." SEC Br. 22 (citing Dkt. 90 at 9). That is incorrect. The quoted sentence appears in the Opinion's *Background* section, immediately preceding the heading "*II. Analysis – A. Disgorgement*." Dkt. 90 at 3. The penalty discussion does not begin until several pages later. *Id.* at 6–9. And as shown above, the District Court returned to the share value issue within the disgorgement analysis itself. *Id.* at 5.

The SEC's own filings likewise deployed the "worthless" characterization in support of *disgorgement*, not penalties. The SEC's statement that the shares "are effectively worthless today without being registered, and are thus not transferable" appears in the disgorgement section of its remedies motion. Dkt. 66 at 7–8 & n.5. Its reply repeated that "the value of CWH equity shares held by donation program participants . . . is effectively 'zero' today because the shares are unregistered," again in its disgorgement argument. Dkt. 85 at 13. The SEC cannot confine a premise it advanced to justify a disgorgement figure to penalties.

### C. Even *if* the issue were forfeited, this Court still should reach it

The SEC acknowledges that this Court may overlook forfeiture "where injustice might otherwise result." SEC Br. 24 (quoting *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016)). Three considerations warrant doing so here. First, the Supreme Court decided *Sripetch v. SEC*, 608 U.S. 555 (2026), after the judgment below. Before *Sripetch*, the parties litigated investor-held value principally through *Govil's* pecuniary-harm requirement. *Sripetch* eliminated that framework and confirmed that disgorgement is limited to the wrongdoer's net profits—placing the value of consideration returned to investors squarely within the net-profits inquiry. *See Kumar*, 2026 U.S. Dist. LEXIS 225065, at *30 (applying *Sripetch* and explaining that, "[a]s opposed to restitution, disgorgement looks to the wrongdoer's gain, not the victim's loss"). An intervening change in the governing framework is a classic reason to reach an argument on appeal. *See e.g.*, *Hormel v. Helvering*, 312 U.S. 552, 557–58 (1941).

Second, this Court is not confined to the arguments pressed below; it may examine "the entire record" and grant the relief that record warrants. *See Ehrlich v. Perper*, 337 F.2d 546, 547 (D.C. Cir. 1964) (per

curiam) (after "most carefully consider[ing] the entire record," ordering a new trial before a different judge because "the ends of justice" so required). Third, enforcing forfeiture would require two operating companies to disgorge more than their net gain—a result *Liu* holds exceeds the bounds of equity. 591 U.S. at 79–80.

### D. The SEC, not CWH and NSEI, bore the initial burden of approximating net profits, and failed to meet that burden by assigning a zero value to the shares retained by investors

Under this Court's framework, the SEC "bears the ultimate burden of persuasion that its disgorgement figure *reasonably approximates* the amount of unjust enrichment." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) (emphasis added). The burden shifts only *after* that showing. *Id.* The SEC made no such showing. It began with gross proceeds, subtracted the expenses it chose to concede, and assigned zero value to the consideration investors received and still hold—shares reflecting their ownership in CWH. SEC Br. 24–26.

The SEC's own submissions show why that was not a reasonable approximation. Within the same motion where the SEC called the shares "effectively worthless," it also told the District Court that "the IP portfolio of the ASM platform is actually quite valuable, with trademarks and

patents potentially worth millions, and with one of the larger shareholders . . . having valued CWH at north of $750,000." Dkt. 66 at 4, 7 n. 5. It even asserted that the "Own the Game" trademark alone may be worth "closer to $1.1 million or even more" (Dkt. 66 at 25; Dkt. 66-1 ¶¶ 132, 141) and acknowledged that the platform "remains operational today with over 14,000 SportsShares trading accounts." Dkt. 66 at 25. The SEC cannot tout a multi-million-dollar valuation of the issuer's assets to maximize penalties while treating its equity as worthless to maximize disgorgement.

The SEC's approach also conflates disgorgement with restitution. Applying *Liu* and *Sripetch*, *Kumar* rejected an award that "encompasse[d] a majority of what the investors lost," holding that "the SEC cannot seek restitution under the guise of a disgorgement award" because "disgorgement looks only to the wrongdoer's gain." 2026 U.S. Dist. LEXIS 225065, at *38. Because "it would be inequitable for a wrongdoer to gain from his own wrong[,]" the court declined to order payment "beyond his ill-gotten gains[,]" noting that the civil penalty already served a punitive function. *Id.* at *35, *38. The same principle applies here. By counting every dollar donors paid and treating their

retained shares as a total loss, the SEC measured investor loss, not CWH and NSEI's net enrichment—and the District Court separately imposed civil penalties to punish and deter.

The SEC's reliance on *SEC v. Whittemore*, 659 F.3d 1 (D.C. Cir. 2011), and *Zacharias v. SEC*, 569 F.3d 458 (D.C. Cir. 2009), is misplaced. SEC Br. 25–26. *Whittemore* concerned a claimed deduction for the "pre-fraud value" of shares the defendant himself sold in a pump-and-dump scheme, where he "introduced no independent evidence of the stock's market value." 659 F.3d at 8. Here, the value at issue is that of consideration the issuer delivered to the investors *and that the investors still hold*, and the record contains evidence of value introduced by the SEC itself. And *Zacharias* declined to vacate because the petitioners "never asked the Commission to value the options." 569 F.3d at 472. CWH and NSEI did ask, and they argued repeatedly that the SEC's valuation was unsupported. Dkt. 81 at 23–24.

Nor does *Ray Consolidated Copper Co. v. United States*, 268 U.S. 373 (1925), help the SEC. SEC Br. 28. *Ray* was a tax refund suit, not a disgorgement case. It concerned how to measure the "fair average value of [a corporation's] capital stock" under the Revenue Act of 1918's excise

tax—a term the Court said "has no fixed meaning in *taxing* statutes" and had to be construed in light of that statute's context and purpose. *Id.* at 374, 376–77 (1925)(emphasis added). *Ray* says nothing about the equitable limits on disgorgement, *First City*'s burden-shifting framework, or offsetting value conveyed to investors. If anything, it cuts against the SEC: the Court sustained the valuation precisely because the Commissioner treated the corporation's assets as "clearly a relevant fact bearing upon" value, and noted he may also have weighed share price and "other factors." *Id.*

The SEC here did the opposite: it disregarded CWH's intellectual property and operating platform to value the retained shares at zero. The passage the SEC invokes—that capital stock, net assets, and shares "are entirely different things" whose values bear "no fixed or necessary relation" to one another, *id.*—explained why the Commissioner could look beyond market price; it does not license ignoring asset value entirely. That asset value and share value differ does not make share value zero. It means share valuation requires analysis—of assets, liabilities, forecasts, and an appropriate illiquidity discount, for example—which an evidentiary hearing would have permitted and the SEC never undertook.

The SEC has elsewhere described unregistered shares as worth "less" than registered counterparts, not *worthless*. *See* Dkt. 81 at 23–24.

Finally, the SEC emphasizes prior counsel's statement that the companies' current value was "impossible to say with any certainty" and that whether it *exceeded $700,000* was "the speculative part." SEC Br. 28–29. Read in full, those statements concede only uncertainty as to the amount, not the existence, of value. In the same passage counsel stated that "the current value of the shares is not nothing." Dkt. 89 at 58:11–12. Uncertainty about the amount of value is resolved by evidence, and when uncertainty persists, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *First City*, 890 F.2d at 1232. While that principle permits a court to resolve close valuation questions against the defendant, it does not permit a court to assign zero value to an asset the District Court itself found "could be of value" (Dkt. 90 at 3). The District Court described share value as "quite speculative" (*id.* at 5), but then declined the hearing that would have addressed that concern.

## III. THE DISTRICT COURT MISAPPLIED *LIU* IN DISALLOWING ALL PROMOTIONAL AND CHARITABLE EXPENSES

### A. *Liu* does not impose a "corporate mission" nexus requirement

*Liu* holds that "courts must deduct legitimate expenses before ordering disgorgement" and that "a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement." 591 U.S. at 91–92. Its only exception is for expenses that are "merely wrongful gains 'under another name.'" *Id.* at 92. The SEC defends the District Court's "nexus" requirement on the theory that a cost cannot be "incurred in producing . . . revenues" without some connection to legitimate operations. SEC Br. 32.

That reasoning inverts *Liu*. The SEC's central theory is that the promotional expenses *did* produce the revenues subject to disgorgement—that promoting ASM generated new accounts and a "significant difference" in donation-program participation. SEC Br. 38; Dkt. 66 at 10. On the SEC's own account, those expenses were "marginal costs incurred in producing the revenues that are subject to disgorgement." 591 U.S. at 91; *see also* SEC Br. 13–14. *Liu* excludes them only if they were "wrongful gains under another name"—that is, if they

enriched the wrongdoer. 591 U.S. at 92. Payments to unaffiliated public-relations firms, event venues, advertisers, and consultants did not enrich Appellants; the money left them. The question *Liu* directs is whether an expense "arguably ha[d] value independent of fueling a fraudulent scheme." 591 U.S. at 92; *see also Kumar*, 2026 U.S. Dist. LEXIS 225065, at *35–36 (holding funds deployed for their represented business purpose had "value independent of fueling a fraudulent scheme" and were not ill-gotten gains, notwithstanding defendant's misrepresentations). The District Court's own finding that the platform "was not, itself, fraudulent," and that the promotional argument "has some merit," Dkt. 90 at 5–6, answers that question in CWH and NSEI's favor as to at least a substantial portion of the disallowed expenses. *See Complete Bus. Sols.*, slip op. at 19 & n.11 (where business did not have "absolutely no value apart from the fraudulent scheme," the SEC's figure was not a reasonable approximation "insofar as it does not deduct any legitimate business expenses").

### B. The all-or-nothing disallowance of promotional expenses was not a reasonable approximation

The SEC accuses CWH and NSEI of mischaracterizing the Opinion as "categorically disallowing" promotional expenses and notes that the

"principal source of funds" formulation appears in a colloquy, not in the Opinion. SEC Br. 34. That is a distinction without a difference. Although the formulation appears in the colloquy, Dkt. 89, it is consistent with the District Court's Memorandum Opinion and Order, Dkts. 90, 91, and signaled to CWH and NSEI where the ruling was heading. And that ruling was categorical: of $733,488 in contested promotional expenses, the District Court allowed zero deductions. Dkt. 90 at 5–6. That outcome is irreconcilable with the District Court's own recognition, at argument, that "it's certainly not the case that the marketing expenses were incurred solely for the purpose of inducing additional investments," and that "the marketing expenses were designed to market the ASM platform, which as [the SEC] said earlier you don't challenge as a general proposition." Dkt. 89 at 17:15–24.

The SEC defends the improper decision by faulting CWH and NSEI for failing to achieve "precise apportionment." SEC Br. 38–39. But disgorgement "need only be a reasonable approximation[,]" *First City*, 890 F.2d at 1231, and that standard runs both ways. A court that accepts that some meaningful portion of an expense category served a legitimate purpose cannot reasonably approximate net profits by allowing none of

it. The SEC, for its part, made no effort at apportionment; as prior counsel explained, it "just disallowed them by a category." Dkt. 89 at 49:9–10. Another court rejected the same approach, faulting the SEC because, "instead of attempting to draw out distinctions and propose a business expense deduction calculation that considers the intertwined structure" of the business, it "opted for an all or nothing approach." *Complete Bus. Sols.*, slip op. at 21. The SEC's categorical approach and the District Court's refusal to estimate combined to produce a figure that, by the District Court's own reasoning, overstated CWH and NSEI's net profits.

The SEC's point about the "Squawk Box" interview, SEC Br. 38, confirms this conclusion. The SEC's evidence is that the interview generated new platform accounts and increased donation participation. Dkt. 66-1 ¶¶ 50–54. Dual-purpose expenditures call for apportionment, not total disallowance. *See Complete Bus. Sols.*, slip op. at 21 (where lawful and unlawful operations were "all intertwined," holding that because "a portion of [the business] was a lawful business, . . . legitimate business expenses must be deducted in accordance with *Liu*").

The record shows why the SEC's claim that the expense descriptions were too "cursory" to permit apportionment, SEC Br. 37, cannot justify total disallowance. Three examples illustrate the point. First, Media Rewards Canada ($190,628) performed work involving the Ontario Securities Commission, educational efforts, and league relationships—services directed to the platform's regulatory standing and operations, not to soliciting donors. Dkt. 66-31 at 2; Dkt 66-23 at 208:23–209:5. CWH and NSEI disputed that exclusion below, Dkt. 81 at 25–26, and the testimony describing that work was before the District Court. Second, the $17,000 New York Times advertisement warned against promoting gambling—an advocacy and educational message, not a solicitation for the donation program. Dkt. 66-31 at 2; Dkt. 66-23 at 209:21–25. Third, the SEC's own factual appendix swept into its promotional exclusion $121,007 in payments to platform users for liquidity and market-making services, while expressly acknowledging that those recipients did not participate in the donation program. Dkt. 66-1 ¶ 101; Dkt. 66-31 at 2. Testimony confirms those payments supported the test market, demonstrated the platform's functionality, and developed its market and data model. Dkt 66-23 at 206:19–208:13.

These expenses constitute "value independent of fueling a fraudulent scheme." *Liu*, 591 U.S. at 92. Courts applying *Liu* have deducted comparable expenditures. *See Complete Bus. Sols.*, slip op. at 22–23 (deducting as legitimate business expenses arm's-length fees paid to "financial firms, marketers, promotional product companies, and more," as well as itemized operating expenses). At a minimum, these identifiable operating expenses warranted apportionment or further development on remand, not wholesale exclusion.

### C. Charitable payments to third parties were never retained by nor unjustly enriched CWH and NSEI.

The SEC relies on prior counsel's statement that the charitable contributions "were not related to the business of" CWH or NSEI. SEC Br. 39 (quoting Dkt. 89 at 50:1–2). That statement concerned whether the charities' purposes matched NSEI's financial-literacy curriculum; it was not a concession that the payments unjustly enriched CWH and NSEI. In the same exchange, however, prior counsel cited Fifth Circuit authority *allowing* the deduction of a charitable contribution where there was "no connection at all between the business and the place that got the

money," because the funds were in fact given to a bona fide charitable entity. Dkt. 89 at 50:3–8.[1]

Under *Liu*, disgorgement is limited to the wrongdoer's net profits. 591 U.S. at 79. Approximately $169,534 was paid to public charities such as World Vision, the American Red Cross, and the World Food Program, in roughly the proportion recommended by a nonprofit strategist and consistent with donors' understanding that their contributions would be used for charitable purposes. Dkt. 66-31 at 2; Dkt. 66-24 at 202:10–203:20; Dkt. 1 ¶ 2. Contemporaneous bank records reflect those payments as donations when made. Dkt. 78-1 at 452–494. Money that passed

[1] The SEC's brief neither addresses nor distinguishes that authority, *Am. Cancer Soc'y v. Cook*, 675 F.3d 524 (5th Cir. 2012). There, an SEC-appointed receiver sought to recover $240,000 that corporate defendants, which had raised millions through unregistered securities offerings, had donated to the American Cancer Society's fundraising gala. *Id.* at 526–27. The Fifth Circuit reversed the judgment against the charity, and rejected not only the receiver's fraudulent-transfer theory but also her alternative equitable request that the court "disgorge" the donations through a constructive trust. *Id.* at 530. Nothing in the court's analysis turned on whether an oil-and-gas drilling program's sponsorship of a cancer charity's ball was related to its business. What mattered was that there was "no evidence that [the] contributions furthered any fraudulent scheme," and that the recipient's "status as a charitable organization" tilted the equities against disgorgement. *Id.* at 530. The same is true here: the SEC has never contended that the charitable payments were used to solicit investors. The funds went to bona fide public charities, exactly as donors were told.

through NSEI—a recognized public charity—to unaffiliated charities, exactly as represented, was never retained by CWH or NSEI. That the funds moved through NSEI's accounts does not make them NSEI's gains: "the issue is not in which account the funds were held but, rather, whether [the defendant] wrongfully gained from [its] misconduct." *Kumar*, 2026 U.S. Dist. LEXIS 225065, at *36. It is not a gain by any name, and ordering its disgorgement imposes a penalty rather than restoring the status quo.

The SEC's fallback—that the donations may have "buil[t] momentum for the fraudulent offering," (SEC Br. 39–40)—is neither a finding below nor supported by any record citation. The District Court instead required proof that the donations "were calculated to boost the ASM brand," Dkt. 90 at 6, a test that conflates the for-profit CWH with the nonprofit NSEI, whose charitable activity needs no commercial justification.

### D. CEO compensation

The SEC argues that CWH and NSEI waived any argument about Mr. Rabalais's compensation. SEC Br. 31 n.3. CWH and NSEI do not ask this Court to resolve that issue. They note only that prior counsel's

concession rested on the premise that Mr. Rabalais's fraudulent conduct disqualified his compensation, while acknowledging the amount was not excessive. Dkt. 89 at 51:6–21. *Liu* asks a different question: whether an expense was a legitimate business cost or a wrongful gain "under another name." 591 U.S. at 92. Compensation for legitimate platform work is the former. CWH and NSEI ask only that, on remand, the District Court be permitted to consider the full record of expenses, including compensation, in reasonably approximating net profits.

## CONCLUSION

This Court should vacate the disgorgement portions of the Final Judgment and remand with instructions to hold an evidentiary hearing at which the parties may present evidence, including live witness testimony subject to cross-examination, to resolve the outstanding factual questions concerning (1) the appropriate apportionment of the promotional and marketing expenses, (2) the deductibility of the charitable payments, and (3) the value of the CWH shares delivered to and retained by investors, and to recalculate disgorgement consistent with *Liu*.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Sean T. Prosser*

Sean T. Prosser (D.C. Cir. Bar No. 66982)
Clare Prober (D.C. Cir. Bar No. 67042)
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C.
3580 Carmel Mountain Road, Ste. 300
San Diego, CA 92130
(858) 314-2152
STProsser@mintz.com
CProber@mintz.com
*Counsel for Appellants Crystal World Holdings, Inc. and New Sports Economy Institute*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 32(a)(7)(B)(i) and Circuit Rule 32 because it contains 6,499 words. This brief also complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Sean T. Prosser*
Sean T. Prosser
*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2026, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

*/s/ Sean T. Prosser*
Sean T. Prosser
*Counsel for Defendants-Appellants*